MERCHANTS' NATIONAL BANK OF OMAHA ET AL., APPELLANTS, v. JOHN W. McDONALD, SHERIFF, ET AL., APPELLEES.

FILED DECEMBER 18, 1901.     No. 10,119.

Commissioner's opinion, Department No. 3.

1. **Insolvent Corporation**: PREFERRING CREDITORS. It is the firmly established rule in this state that the officers of an insolvent corporation can not prefer debts to third persons for which they are obligated as sureties.

2. **Creditors' Bill**: LIEN. The filing of a creditors' bill establishes a lien in favor of the plaintiff on the property or fund sought to be reached thereby from the date of the filing. One who intervenes in an action in the nature of a creditors' bill is entitled to a lien on the fund sought to be reached in such proceedings from the date of such intervention.

3. **Creditor**: JUDGMENT: INSOLVENT CORPORATION. A creditor whose claim has not been reduced to judgment can not maintain an action against an insolvent corporation for the ratable distribution of its assets among its creditors; and a creditor who has

reduced his claim to judgment and had execution thereon re-
turned unsatisfied who intervenes in such action is entitled to
a preference in the payment of his claim.

4. **Admission of Evidence:** TRIAL TO COURT: INCOMPETENT AND IM-
MATERIAL EVIDENCE SOLE BASIS OF FINDING. It is a settled rule
of this court that a judgment will not be reversed simply be-
cause the trial court, sitting without a jury, erred in admitting
incompetent or immaterial evidence; but this rule has no ap-
plication in a case in which it appears that such evidence is
the sole basis of the findings and judgment assailed.

5. **Replevin From Sheriff:** MEASURE OF DAMAGES. When personal
property held by a sheriff under a valid writ of attachment is
wrongfully taken from him in replevin, by a person not a party
to the suit, the measure of damages, in case the property can
not be returned, is its value at the time of the taking, with in-
terest, not exceeding the amount required to satisfy the writs.

6. ——: ——: EVIDENCE. When personal property, consist-
ing of a stock of merchandise held by a sheriff under a valid
writ of attachment, is wrongfully taken from him in replevin
by a person not a party to the suit, it is error to confine the
evidence upon the measure of damages to the market value of
the goods in the ordinary course of trade and to the price at
which new fresh goods of like descriptions could have been
purchased from wholesale dealers in them. The true inquiry
in such case is what the value of the goods was at the time of
the taking in the situation in which they then were, having a
view to the manner in which the sheriff, if his possession had
not been disturbed, could lawfully have disposed of them; and
if there is no evidence in the record directed to that inquiry,
there is no competent evidence from which to assess the amount
of the sheriff's recovery.

7. ——: ——: ——: WITNESS. In a case like the foregoing
testimony by competent witnesses to the value of the goods in
the ordinary course of trade is admissible, as having an indirect
bearing upon the principal inquiry; but when it appears that
the goods, or a part of them, are to some extent shopworn and
deteriorated in value, a witness who has never seen them or
one whose only knowledge of value is derived from the inspec-
tion of invoices and the examination of trade catalogues of
prices, or one who is ignorant of the kind of manufacture and
of the description of the form and structure of the articles in
controversy, is incompetent to testify as to values.

8. **Review.** On an appeal to this court, in a case in which an im-
portant question is that of value, and in which there is not
sufficient evidence in the record to permit of its adjudication,
the judgment of the district court will be reversed and a new
trial awarded.

APPEAL from the district court for Douglas county. Heard below before SCOTT, J.   *Reversed.*

Action by John W. McDonald, sheriff, against the Merchants' National Bank of Omaha, consolidated with other actions for the distribution of the assets of the Hobrecker Stove Company.

*George E. Pritchett* and *Warren Switzler*, for appellants.

*Edson Rich, Winfield S. Strawn, W. A. Corson, C. W. DeLamatre, Arthur C. Wakeley, Bartlett, Baldrige & De Bord* and *Congdon & Parish*, contra. 

DUFFIE, C.

On April 24, 1896, the Hobrecker Stove Company, a corporation doing business in the city of Omaha, made a bill of sale of all its stock in trade to the Merchants' National Bank of Omaha, to secure the payment of notes in the sum of about $10,000, claimed to be made by said corporation to the bank, and which notes James C. McKell, a director and president of the corporation, signed as co-maker or surety. On the same day, and as a part of the same transaction, the corporation assigned all its book accounts and bills receivable to Luther Drake, trustee, for the purpose of further securing the payment of said notes to the bank. It is conceded that at that time the corporation was insolvent. On said April 24, 1896, the Ellwood Gas & Vapor Stove Company commenced an action in the district court against the Hobrecker Stove Company to recover the sum of about $1,000, and a writ of attachment was issued in that action and levied upon a portion of the stock in trade of the defendant, the Hobrecker Stove Company. On April 27, 1896, the Cleveland Steel Range Company and the Galusha Stove Company each commenced actions in the district court against the Hobrecker Stove Company, which actions were aided by attachment, and the remainder of the stock in trade, not levied on under the attachment

in favor of the Ellwood Gas & Vapor Stove Company, was attached by the sheriff of Douglas county. On May 27, 1896, this action was commenced by the March-Brownback Stove Company, a general creditor of the Hobrecker Stove Company, the action being in the nature of a creditors' bill, alleging the insolvency of the defendant corporation, that it had suspended business and was no longer a going concern, charging that the assets of the corporation were a trust fund for the benefit of all its creditors, and asking the court to appoint a receiver and take possession of the assets and make a distribution of them ratably among the creditors of the concern. The petition recited the bill of sale made by the defendant corporation to the Merchants' National Bank, as well also as the assignment to Luther Drake, trustee, of the book accounts and bills receivable, and asked that these conveyances and the attachments above referred to might be set aside and the property covered thereby held to be the assets of the corporation and distributed among its creditors. The Merchants' National Bank, Drake, trustee, and the attaching creditors of the corporation were made parties defendant to this bill. On June 8, 1896, the Merchants' National Bank brought an action of replevin against the sheriff of Douglas County, Nebraska, to recover possession of the goods under its bill of sale, and which had been taken possession of by the sheriff under the attachments in the three actions above mentioned. May 28, 1897, the Cannonsburg Iron and Steel Company filed a supplemental answer and cross-bill in this action, alleging the entry of a judgment in its favor against the Hobrecker Stove Company subsequent to the commencement of the action, and asking a ratable distribution of the assets. October 19, 1896, the Novelty Manufacturing Company filed its answer and cross-bill in this action, and on October 29, 1896, the A. J. Linderman & Hoverson Company filed its answer and cross-bill in this action. The two parties last named are non-judgment creditors of the Hobrecker Stove Company. March 6, 1897, the Dayton

Manufacturing Company, the Victor Stove Company, the Farmers' National Bank and Schill Bros. intervened in the action, alleging in their petition of intervention that they were creditors of the Hobrecker Stove Company, that they had reduced their claims to judgment, had execution issued and returned unsatisfied and had thereafter garnished the Merchants' National Bank and Luther Drake, trustee, as parties having property and funds of the Hobrecker Stove Company in possession, and claiming a priority in the distribution of the assets of the defendant corporation over all creditors, with the exception of the three attaching creditors first above mentioned. November 1, 1897, the Belding-Hall Manufacturing Company, a creditor at large, intervened in this action, and asked to be allowed to participate in the distribution of the assets. By consent of all the parties, the replevin action brought by the Merchants' National Bank against McDonald, sheriff was consolidated with this action and tried to the court. Upon the trial a decree was entered canceling the bill of sale made by the defendant corporation to the Merchants' National Bank, as well also as the assignment of book accounts and bills receivable made to Drake, trustee, and ordering a distribution of the assets of the corporation, giving the three attaching creditors first above named a first lien on the assets for the payment in full of their claims, and directing the remaining assets to be ratably distributed among all the creditors. It was further found that the value of the property taken by the bank in the action of replevin against the sheriff, together with interest thereon to the date of trial, was $7,682, and that the amount collected by the Merchants' National Bank of Omaha on the accounts and bills receivable assigned to Drake, as trustee, amounted, with interest, to the sum of $1,429.85, and these several amounts the bank was ordered to pay to the clerk of the court, to be distributed under the terms of the decree. The Merchants' National Bank has taken an appeal from this decree, and insists that the value of the goods taken in re-

plevin found by the court is excessive, as well also as the amounts collected on the accounts. The four interven-ing parties whose claims had been reduced to judgment prior to their intervention in this case, and who had garn-ished the bank and Drake, trustee, also appealed and insist that the court erred in not allowing them a prefer-ence in the payment of their claims over the non-judgment creditors.

The conveyance to the bank and to Drake, trustee, are void, for two reasons: First. McKell, a director of and president of the Hobrecker Company, was a co-maker or surety upon the notes which these conveyances were made to secure. An insolvent corporation can not prefer its offi-cers by securing debts due to third parties for which they are liable. *Tillson v. Downing,* 45 Nebr., 549; *Ingwersen v. Edgecombe,* 42 Nebr., 740. Second. By a supplemental decree entered April 13, 1898, it was found that the debt due the bank, and which these conveyances were made to secure, was the individual debt of McKell, for which the Hobrecker Stove Company was in nowise liable. The question raised by the appeal of the interveners is not only important, but interesting. Are they entitled to priority in the distribution of the assets of the corporation over the non-judgment creditors because of their proceeding in reducing their claims to judgment, and causing the parties in possession of the assets to be garnished, and thereafter intervening in this action? The plaintiff the March-Brown-back Stove Company undoubtedly filed its petition in the belief that this court would adopt what is commonly known as the "trust fund doctrine" in relation to insolvent corporations, and deny a preference to any creditor of the corporation, regardless of the steps that had been taken to secure such priority. The question was an open one at the time this action was commenced, but has since been settled against the contention of the plaintiff in *Shaw v. Robinson,* 50 Nebr., 403. Upon the theory that the assets of an in-solvent corporation are a trust fund, to be distributed rat-ably among the creditors of the concern, the action was

well brought and a court of equity was the proper tribunal to ascertain the amount of the liabilities and distribute the assets ratably. By the rule announced in *Shaw v. Robinson, supra,* the insolvent corporation may give one creditor a preference over another, and by analogy one creditor may, by his superior diligence, secure a preference in the payment of his claim over those who are less diligent. When the circumstances are such as to allow of legal proceedings, those first reaching the property of the corporation by attachment or other proper process secure a preference; but when the assets of the corporation are beyond the reach of legal process then a court of equity must be called on to assist the creditor, and the same rules applicable in other equity cases must be observed. It being settled that the plaintiff in this action was not entitled to a ratable distribution of the assets of the Hobrecker Stove Company under the "trust-fund doctrine," the petition must be regarded as a simple creditors' bill; and judged of in that light it was wholly insufficient, because the plaintiff had not reduced its claim to judgment and exhausted its legal remedies. The rule has always obtained in this state that a general creditor has no standing to maintain a creditors' bill. A judgment or special lien is an indispensable requisite. *Weil v. Lankins,* 3 Nebr., 384; *Weinland v. Cochran,* 9 Nebr., 480; *Crowell v. Horacek,* 12 Nebr., 622; *Keene v. Sallenbach,* 15 Nebr., 200, 202. Like all rules this has its exceptions, one being that property in this state may be reached where the defendant is a non-resident, thus making it impossible to procure a personal judgment against him here; and other instances are given by Smith in his Equitable Remedies of Creditors, sec. 167. The plaintiff, because its claims had not been reduced to judgment, stood in no position to pursue the property of the Hobrecker Stove Company or the funds arising therefrom into the hands of the bank, as against the objection of any interested party having a better right thereto, and the question is, do the intervening parties, who had put their claims into judgment and garnished the holder of

the fund, have a preference over the other parties to the suit, who had not attached before the commencement of this action? Incidently, it might be stated that, as to the attaching creditors, the decree, so far as it gave them a preference, was by consent of all the parties to the suit, and no one seeks by this appeal to modify it in that particular, the principal contention being as to whether the interveners are also entitled to priority. It must, we think, be obvious that, if the plaintiff stood in no position to maintain its action because it had not reduced its claim to judgment, the non-judgment defendants, who, by their cross-bills, joined with the plaintiff in asking a pro-rata distribution of the assets of the defendant corporation, occupied no higher or better ground than did the plaintiff. What, then, are the rights of the interveners? They were not originally made parties to this action. After the action was commenced, they put their claims against the Hobrecker Stove Company into judgment, and after execution returned unsatisfied garnished the bank. Upon a return of execution unsatisfied, they had a right, if they desired, to institute independent actions to reach this fund. *Hall v. Alabama Terminal Co.,* 104 Ala., 577, 53 Am. St. Rep., 87. Instead of doing so, they took advantage of section 50a of our Code of Civil Procedure, and intervened in this action, asserting their prior right to the fund. That section, in substance, provides that any person who has or claims an interest in the matter in litigation, in the success of either of the parties to an action, or against both, may become a party to the action, either by joining the plaintiff in claiming what is sought by the petition or by uniting with the defendants in resisting the claim of the plaintiff or by demanding anything adversely to both the plaintiff and defendant. In this case the interveners were seeking relief as against both the plaintiff and the defendants. They asked as against the defendants the application of its assets to the satisfaction of their judgments, and, as against the plaintiff and cross-petitioners, that their claim to the fund should be preferred over all others. In this attitude of the

case, we are of the opinion that the interveners stand on independent grounds asking relief against all the other parties to the action, and that their rights must be determined as if they had brought an independent action to which all the other parties to the suit were made parties defendant.

As we now view the case, it is not necessary to determine the effect of the garnishment proceedings instituted by the interveners to reach the fund in controversy. The authorities are all agreed that the filing of a creditors' bill gives the plaintiff a lien upon the property sought to be reached thereby. It is an equitable levy upon the property, and binds it from the time of the filing of the bill. When these parties intervened in this action they acquired a lien on the fund in dispute prior and superior to the non-judgment creditors, who had not taken the necessary steps to maintain a creditors' bill to reach the fund. Their intervention was the first equitable levy upon the fund, excluding the garnishment proceedings from consideration, and the effect of which we are not considering. This is well illustrated in *Miers & Coulson v. Zanesville and Mayville Turnpike Co.*, 13 Ohio, 197, where a bill was brought by a judgment creditor to reach the arrears of certain shares of stock subscribed and unpaid. By its answer the company admitted the existence of the assets, and asked that an account be taken of the creditors of the company, and the amount realized distributed equally among them all. The court refused this, saying: "This claim of the company for equal distribution is inadmissible; for the vigilant creditor, pursuing his claim, acquires a preferable equity, which attaches and becomes a specific lien by the filing of his bill." This is the general rule; and so, whether the lien of the interveners dates from the time of their garnishment, or the time when they intervened in this suit, their lien is prior to the rights of the non-judgment creditors who had failed to take the necessary steps to maintain their suit and obtain a lien.

We have not overlooked the argument made on behalf of

the plaintiff that the Hobrecker Stove Company was wholly insolvent and that reducing its claim to judgment and issuing execution would be a useless and a fruitless proceeding. Cases are cited holding that under such circumstances a creditors' bill may be maintained without showing a judgment. These cases seemingly overlook the right of a defendant to have his liability to a judgment and the amount thereof tried to a jury, instead of being passed upon by the chancellor sitting in equity; but whether these cases are well founded on principle or not, we think the practice in this state in bringing creditors' bills has been too firmly established to be departed from at this time.

The amount of the recovery allowed by the court in this case, and the character of the evidence upon which it is based, are questions which have caused us much trouble and perplexity. Much of the testimony on the question of the value of the goods, if not wholly incompetent, is of the most unsatisfactory character. It must be conceded, we think, that the most satisfactory testimony as to value came from the witnesses Ferrin and Dickey, and this for the reasons, first, it is practically conceded that the inventory which accompanied the bill of sale made by the stove company to the bank was not made at the time, and does not state correctly the quantity or description of the goods delivered at the time. After the seizure of the goods upon the several attachments in behalf of certain of the creditors intervening in this action, certain of them were, by the sheriff, released from the levies, as not being the property of the attachment defendants, and the whole or part of the remainder were taken in replevin at the suit of the appellant, and the goods so taken are alone really in controversy in this suit. This was fully recognized by the trial court in his fourteenth finding of the fact. Ferrin and Dickey are the only witnesses who knew, or who attempted to tell, what the goods so taken were, or what was their value. There is in the record a document which is stipulated to be a "copy of the original writ of replevin" and which was received without objection; but this stipulation

does not refer to or purport to authenticate the written statement, presumably annexed to the copy and immediately following it in the record, which is not represented to be the return to the original writ or a copy of it, but which, on the contrary, recites that such a return was never made and the coroner's reason for a failure to make one. There is no evidence, in other words, that the recitals made in this instrument are true, except the signature thereto of the coroner, which is not official. This omission is not, we think, supplied by the testimony of the coroner, who was sworn as a witness, that he took substantially all the goods mentioned in the writ, accompanied by the admission that he made no list of them himself, and that the appraisers' schedule was lost and he had not retained a copy of it. The only evidence in any degree satisfactory as to what goods were taken in replevin is that of Ferrin, who was one of the appraisers in that suit, and who testified that he wrote the list and appraisement, at the same time making a copy of it, which he retained until he compared it with and verified with it another list, which he made after the property had been turned over to the plaintiff in replevin. This latter list, which he says corresponds with the official schedule, is contained in the record. Even this evidence is not above criticism, but it is substantially all that there is at hand. Ferrin was an experienced salesman of goods of the description of those in controversy, and for some time previous to the failure had been employed by the stove company in that capacity. He was intimately familiar with the stock in hand, and knew its conditions and value as well, perhaps, as it was possible for anybody to know them, and he had the advantage of an opportunity to test that knowledge by making actual sales of the goods as the agent of the bank. Dickey, the other appraiser in the replevin suit, testified that the goods taken were all listed and appraised at their full market value, with which he was at that time acquainted, he being then engaged in the business of handling such goods, but he was not permitted to testify, in answer to questions by the bank, what

the amount of the appraisement was, and there is no evidence what the value of the property was at the time it was taken by the coroner. It is fair to say, however, that the fact that more definite evidence in these particulars is not contained in the record, is not the fault of counsel for the appellant bank.

A second reason for regarding the testimony of the above mentioned witnesses as the most satisfactory is that the remaining witnesses upon the subject, Packard, King and Roberts, confess their own, we will not say incompetency, but lack of satisfactory information or means of information on the question of value. It is conceded in the briefs of counsel that the finding of the trial court with respect to values was based mainly, if not exclusively, upon the testimony of Packard. The witness, prior to the break-up, had been secretary to the stove company, and previous to that time had been secretary and treasurer of another similar concern at Hannibal, Missouri, but he admits that the knowledge of the stove business which he acquired in his former situation was "superficial" because his duties required him to be in the office, and that his knowledge of the business which he acquired in the service of the stove company, "was principally gained from the invoices which all passed through my hands, and from which I arrived at the cost of the articles, and by reference to those invoices or the books, that I made from references to the invoices." From this knowledge and from memoranda which he made from these sources and from comparing catalogues of wholesale dealers, and without any avowed or apparent familiarity with or knowledge of the goods themselves, or of their condition, he undertook to testify as to their value by reference to a list, and stating what he supposed to have been their cost price, and this, not withstanding that the business had been carried on for several years, and that it was not disputed that the goods were, to some extent, rusted, shop-worn, broken and deteriorated in value. In our opinion, the testimony of this witness was of little value in fixing the value of the goods taken on the writ of

replevin.    The witness King was a retail stove dealer, of some thirteen years' experience in the city of Omaha, and was one of the appraisers at the time the goods were taken in attachment, and testified generally that the list made at the time was correct, and that the goods were appraised at their then value, which was in the month of April, but he never saw the property afterwards, and did not pretend to testify as to their value in the following June, when they were taken under the order of replevin, or to know what goods were taken under the latter writ.    On a somewhat extended cross-examination, going over the list in detail, he was unable to say that at the time of testifying he had any knowledge whatever of the value at that time, or at the time of the appraisement, of any item in the schedule.    Not only so, but he admitted, frankly enough, that he was unfamiliar both with the manufacture and manner of construction of many of the articles, and that all he knew about it was by looking at the list made at the time of appraisement, and the figures opposite, and then to say that that was the value.    The testimony of this witness is therefore not of that satisfactory character upon which a finding should be based if better evidence can be had. The witness Roberts, who confesses never to have see.: any of the goods in controversy, was shown a list represented to be a schedule of the goods taken in attachment and asked to state the value in June, 1896, of the several items and descriptions of goods it contained.    This he did, stating that the prices so given were those at which new, fresh goods could be obtained of the jobbing trade.    It will hardly be claimed that the right of the parties should be determined and fixed by evidence of this character.    In considering the character of evidence on which the finding and judgment of the district court was based, another matter should be considered.    At the time the goods were taken in replevin, they were held under attachments sued out by the attaching creditors of the stove company, and but for the taking they would have been sold under the writs or upon orders of sale following the judgments in the attach-

ment suits. What a stock of stoves and kindred hardware would have brought at sheriff's sale in the middle of summer of such year, financially, as 1896, it is not worth while now to conjecture; but it is entirely plain that that of which the bank deprived the plaintiffs and interveners was not the fair market value of the goods in the ordinary course of trade, but what could have been obtained for them in the only manner in which they could lawfully have disposed of them, namely, at forced sale. It was to the ascertainment of this amount to which the evidence should have been directed. The case and the measure of damages would have been far different if the stove company had been plaintiff in an action for damages for the wrongful taking of their goods on mesne or final process.

It is a settled rule of this court that a judgment will not be reversed solely because the trial court, sitting without a jury, erred in admitting incompetent or immaterial evidence; but this rule has no application in an instance in which it is apparent that such evidence is the sole basis of the findings and judgment assailed. Such seems to be the present case. In the present condition of the case, as we are unable to determine with any certainty the value of the goods, we have concluded that the best interests of the parties will be subserved by remanding it for another trial, in which, we have no doubt, better and more satisfactory evidence of the value of the goods taken in replevin by the bank can be secured. When the amount is ascertained, it should be distributed among the parties, by first paying the three attaching creditors, whose suits were brought on the 24th and 27th days of April, the full amount of their claims; secondly, to distribute the remainder, so far as necessary, ratably among the creditors whose claims have been reduced to judgment prior to their intervention in this action; and, third, the remainder of the funds to be distributed ratably among the creditors of the company who are parties to this suit; and we so recommend.

AMES and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that the decree appealed from be reversed and the case remanded to the district court for a new trial; that any amount recovered against the bank on such new trial be distributed among the parties as directed in the foregoing opinion.

REVERSED AND REMANDED.

March 19, 1902, the following supplemental opinion was filed:

Replevin: ATTACHMENT: MEASURE OF DAMAGES. When goods are wrongfully taken in replevin from a sheriff, who holds them under levies for the satisfaction of attachments in his hands, the measure of damages is the loss accruing to the attachment plaintiffs, because of being deprived of the right to have their writ executed; and in such case the ultimate inquiry is, what was the value of the goods in the only market and manner in which the sheriff could have lawfully disposed of them?

AMES, C.

This is a motion for a rehearing. A stock of stoves and kindred hardware were wrongfully taken upon a writ of replevin from a sheriff, who held them under attachment. The principal ground of complaint in the motion is that this court held that the inquiry of damages in an action by the sheriff against the plaintiff in replevin is the actual damage suffered by the plaintiffs in attachment, viz., what the latter could have obtained for the property in the only manner in which they could lawfully have realized upon it, namely, by a public sale after due advertisement. It is argued that this measure is too speculative, and is therefore incapable of accurate ascertainment. That it is to a degree subject to this criticism is conceded, but it has the merit of taking into account the actual situation of affairs. As much can not be said for the rule contended for by the appellees, which is, as interpreted by their argument, that the correct measure is the fair market value of the goods in Omaha, where they were situated. In the first place, this rule presupposes that there was in that city, in the

midsummer of 1896, a market value, fair or otherwise, for a stock amounting to several thousand dollars, like the one in controversy. Of this there is no evidence in the record. There was an attempt to prove, by witnesses not shown to have been competent, what such a stock probably could have been bought for from jobbers and manufacturers in distant eastern cities, which tends somewhat to show, but by no means conclusively, what it would have been worth or have cost laid down in Omaha, and there is some evidence what, in the opinion of the witnesses, it might have been sold for in the ordinary course of retail trade in the last-mentioned city; but this estimate makes no account of the time which probably would have been consumed, or of the expense likely to have been incurred, in making such a disposition of it. That this inquiry was less speculative than that proposed by this court we are unable to see. The argument of counsel amounts to this, practically, that because it is difficult, or perhaps impossible, to ascertain with accuracy the sum which could have been obtained for the goods by the sheriff in the time and manner in which he would have been obliged to sell them, therefore the true rule of damages is what they would have sold for at a time and in a manner which were, under the circumstances, wholly unavailable, and resort to which, in the absence of agreement by the parties, would have been forbidden by law. It is a rigid rule in this state, upheld by a multitude of decisions, that in an action for damages, whether upon contract or for tort, the recovery is limited to such sum as will afford to the complaining party actual compensation for the injury inflicted. In many cases the ascertainment of that amount is, from the very nature of the case, speculative, and can be nothing more than a more or less vague opinion, derived from a general survey of all the circumstances bearing upon the inquiry; but this fact does not justify confining the inquiry to part of those circumstances only. In a case like the one at bar, the scope of the investigation should be sufficiently broad to include evidence, by competent witnesses, of the value

of the goods in all the various situations in which they might probably have been converted into money at the place, and within the time, in which such conversion must necessarily have been made; and, the goods having been sold, the circumstances and manner of sale, and the amount obtained for them, were proper matters to be inquired into. The more obscure the inquiry, the greater the need of illumination. The ultimate fact to be ascertained as nearly as possible is to what extent, or in what amount, have the attaching creditors been damaged by having been deprived of the opportunity to execute their process upon the property. From the necessities of the case the evidence can not rise above the rank of the opinions of witnesses, but it is equally important that the opinion of no incompetent witness should be admitted, and that the opinion of no competent witness, concerning any matter bearing upon the ultimate issue, should be excluded. Evidence of the manufacturers' and jobbers' prices, and of the wholesale and retail value of the goods, if offered by competent witnesses, is admissible, and in some cases may be the only evidence obtainable; but it is not free from the criticism that it is speculative, and it has only an indirect bearing upon the real matter in issue, which such evidence alone, when that which is more direct is at hand, is incompetent to determine. If, for the sake of verbal uniformity, the measure of damages in such cases is stated to be the market value of the property taken, still it must be understood to mean in the only market and manner in which the sheriff could lawfully have disposed of them.

It is recommended that the motion for a rehearing be denied.

DUFFIE and ALBERT, CC., concur.

By the Court: For reasons stated in the foregoing opinion, it is ordered that the motion for rehearing be denied.

REHEARING DENIED.